## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION

| | | |
|---|---|---|
| ARI COHEN, SHANIE COHEN, COHEN SPECIAL FAMILY TRUST, LOIS COHEN JSK FAMILY PARTNERSHIP LP, DONIEL COHEN | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No.: |
| v. | ) ) | |
| TZVI FEINER, FNR HEALTHCARE, LLC | ) ) ) | |
| Defendants | ) ) | |

### COMPLAINT

ARI COHEN, SHANIE COHEN, COHEN SPECIAL FAMILY TRUST, LOIS COHEN, and

JSK FAMILY PARTNERSHIP LP and DONIEL COHEN (collectively, "Plaintiffs"), by their attorney,

Harold L. Moskowitz, hereby complains against TZVI FEINER ("Feiner") and FNR HEALTHCARE,

LLC ("FNR" and, collectively, the "Defendants") as follows:

### Nature of the Case

1.    This matter is brought by Plaintiffs, ARI COHEN, SHANIE COHEN, COHEN

SPECIAL FAMILY TRUST, LOIS COHEN, JSK FAMILY PARTNERSHIP LP, and DONIEL

COHEN against Defendants TZVI FEINER and FNR HEALTHCARE, LLC under the Racketeering

Influenced and Corrupt Organization Act (the "Act"), 18 U.S.C.§1962(a) and §1965, for a series of

fraudulent schemes devised, conducted, participated and/or assisted in by Defendants to conduct or

participate in, to various degrees, directly or indirectly, the conduct of the affairs of FNR through a

pattern of racketeering activity, or to conspire to do so, or to conspire to assist FNR in conducting a

pattern of racketeering activity and to wrongfully and unlawfully divert assets of the Plaintiffs, and to

conspire to assist to do so, all to the detriment of Plaintiffs. The Plaintiffs seeks to use the provisions

of the Act to enjoin Defendants and recover their damages resulting from said schemes pursuant to the

Act. In addition, the Plaintiffs seeks to supplementary recover damages as a result of the Defendants' breaches of contract, breaches of fiduciary duties, conversion, and to obtain a constructive trust over monies improperly obtained. The relief sought includes actual damages, punitive damages and treble damages arising from the scheme to defraud set forth herein, an accounting, costs of investigation and suit, statutory interest and attorney's fees.

2.     Defendants Feiner and FNR participated in and perpetrated frauds upon Plaintiffs, as well as countless other victims ranging from holocaust survivors, school teachers, sophisticated banking institutions and regular investors and businessmen like the Plaintiffs. Defendants' schemes have had a profound destructive impact on the Plaintiffs and in every part of the Jewish community. As is so often the case, Defendants' schemes revolved around dangled promises of substantial profits in return for an initial investment in order to lure in potential victims. Feiner and FNR used their financial investment experience and expertise, as well as other Ponzi schemes, to shroud their schemes from scrutiny and deceived Plaintiffs and other investors for years. In the period of five years that Feiner and FNR perpetrated their schemes, Feiner and FNR stole and diverted over $35 million dollars from a wide range of investors, friends, fellow congregants, his child's own school and principal, and other victims.

3.     In this case as well as others, Feiner created limited liability companies to hold title to retirement home facilities and other properties ("RealCo") acquired in the schemes, the daily operations of the which facilities would be handled by a limited liability operating company ("OpCo") in which Feiner had secret and undisclosed interests. The OpCo would then pay rent to the RealCo. Feiner would install himself as the sole-manager of the RealCo with extensive powers to carry out his plans – including "lending" money to himself and other related entities. As a further part of the scheme to defraud, Feiner deceived Plaintiffs by misrepresenting his cash investment (and the ultimate total cash investments from all sources) in these entities. By doing so, Feiner obtained a much higher membership

2

interest in the entities than the Plaintiffs would otherwise have agreed to if they had known that they and the other investors financed 100% of the acquisition of a facility rather than a portion. Feiner's intention after acquiring the retirement facilities was to siphon the entities' cash and profits in the form of fake "loans" for his benefit and the benefit of his other businesses, his family members and other family trusts and secrete the profits from the ultimate sales. In the last stage, Feiner and FNR secretly sold many of the RealCos' facilities and secreted the cash. Many of these secret sales were accomplished through the grant to, and execution of, purchase options by the OpCo, the purchase price of which option was different that the actual purchase price actually paid. Feiner, as president, controlled and used FNR to solicit, induce, aggregate, disburse and manage investors' capital, to acquire and dispose of retirement healthcare facilities, and convert proceeds from the sale of the retirement healthcare facilities to themselves.

4.      Defendants' schemes relied on further investments from Plaintiffs and others. Feiner induced additional investments by initially making it appear he was meeting his representations and obligations by making distributions from time to time -- enough to assuage any suspicions from Plaintiffs and other investors. Defendants also delayed discovery of their schemes by deceiving the Plaintiffs that defendants were negotiating with potential buyers even though they had already sold the properties and pocketed the proceeds.

5.      Plaintiffs were directly victimized by this conduct. As a direct and proximate cause the schemes described in this Complaint, the Plaintiffs have suffered losses of $3,000,000.00 in the form of fraudulent inducement of investments; unpaid distributions; unknown unpaid proceeds from any disposition of the RealCos; and any pro-rata share of all funds embezzled and diverted from said entities.

**Jurisdiction and Venue**

3

6.     The Court has subject matter jurisdiction over federal law claims under 28 U.S.C.§1331 and 18 U.S.C. §1965(a).

7.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391 and 18 U.S.C. §1965 because the Defendants reside in, is found in, has an agent in, and/or transacts their affairs in, the Northern District of Illinois where a substantial part of the events complained of occurred.

### Parties

8.     ARI COHEN ("Ari") and SHANIE COHEN ("Shani"), are married individuals whose residences are in the City of Chicago, County of Cook, State of Illinois.

9.     COHEN SPECIAL FAMILY TRUST ("CST"), is an Illinois trust whose principal place of business is in the State of Illinois, County of Cook, State of Illinois.

10.     LOIS COHEN ("Lois") is a individual whose residence is on the City of Chicago, County of Cook, State of Illinois.

11.     JSK FAMILY PARTNERSHIP LP ("JSK"), is an Illinois limited partnership whose principal place of business is in the State of Illinois, County of Cook, State of Illinois.

12.     DONIEL COHEN ("Doniel") is an individual whose residence is on the City of Chicago, County of Cook, State of Illinois.

13.     FEINER is an individual whose residence is on the City of Chicago, County of Cook, State of Illinois.

14.     FNR is an Illinois limited liability company whose principal place of business is in the State of Illinois, County of Cook, State of Illinois.

### FACTS COMMON TO ALL COUNTS

**The Ventures**

**Lincoln Manor**

4

15.     By 2010, Feiner had forged a reputation in the Orthodox Jewish community as a successful, philanthropic real estate owner and nursing home facility operator.

16.     In late 2010 and early 2011, Feiner approached Ari and asked whether he would be interested in, or knew people who might be interested in, joining in a joint venture to purchase nursing homes throughout the country. Ari informed him that there may be some interest, but to inquire again if and when another deal arose.

16.     The first facility which Feiner approached Ari about was a facility called Lincoln Manor, a 140 bed nursing facility in Decatur, Illinois. According to Feiner and his selling memorandum, the arrangement was to entail the facility being rented to another local operator, a Yossi Meystel ("Meystel"), who would run the facility pursuant to a five (5) year lease with an option to buy. In addition, Meystel was to deposit a hefty security deposit. Lastly, pursuant to the Private Placement Memorandum given to Ari, Meystel had also contractually promised to make capital improvements to the facility in an amount approximating $500,000 – which almost guaranteed him exercising the option to purchase.

17.     As a result, Feiner created an Illinois LLC named FNR Decataur, LLC to purchase the home in April, 2011. Ari and Shani invested $100,000, Lois and her husband (now deceased) invested another $100,000, and CST also invested $100,000.

18.     Meystel never put in any improvements or exercised the option to purchase. Feiner then claimed that he was unable to find another tenant for the facility. Then, in a contradictory statement, he claimed that he "hired' a local operator to operate the facility, but she did not "pay rent." Feiner told the Plaintiffs and the other investors that as a result, he gave the facility back to the lender. However, on September 17, 2017, the Decatur Herald and Review published a story claiming that the Lincoln Manor Healthcare was closing its doors and gave patients 48 hours to relocate. It stated:

5

"The owner of the facility is Zvi Feiner, who stopped paying the bills for Lincoln Manor, which Powell said facility administrator Paula Mason told the employees at a meeting Wednesday. This led to Lincoln Manor shutting its doors." [1]

19.     All distributions stopped in early 2016, more than 14 months before Feiner closed the facility. On basis and belief, during the years of operation, Feiner and/or FNR borrowed sums from the LLC and have never repaid those sums.

20.     In addition, in 2016 Feiner caused to be created a limited liability company called Lincoln Manor Healthcare, LLC. – the same name as the facility more than a year before closure.

**Mayfield**

22.     In December, 2012, Feiner sent an email to Ari with information about a second deal. This was not a nursing facility, but a commercial office building in Mayfield, Ohio. This investment was marketed to Ari as being a great anchor tenant, a Hilton Hotel, which leased part of the space for their conventions. Then, as in Decatur, the property suddenly stopped making distributions in -2016. In January, 2017, Feiner notified Ari and the other investors that the property lost its main tenant which, allegedly, needed more space and vacated the property. As a result, it claimed, no more distributions would be made.

22.     Shortly thereafter, the mortgage holder filed a foreclosure action in which it cited numerous defaults under the mortgage, including unpaid real estate taxes, mechanics liens, failure to comply with the duties of a Lessor under the tenant leases and other liens. A receiver was appointed and stated that no surplus is expected if and when the property sells.

23.     On basis and belief, and as been the case with the other investments, Feiner has caused the LLC to "loan" monies to him and his related entities and has cause excess distributions to himself in excess of his share.

_____

[1] https://herald-review.com/.../lincoln-manor-healthcare.../article_f635df8b-c135-586a-.

6

### South Holland

24.     In a classic case of bait and switch, Feiner approached Ari in January, 2013 to invest in what the selling materials said was an "all inclusive senior care campus" (the "Campus"). Said "Campus" was to include two separate senior facilities: a licensed 171 bed skilled care nursing facility (but then only had 1240 beds) and a 253 licensed unit senior retirement home called Holland Home ("HH"). The skilled facility was named Providence Healthcare and Rehabilitation Center ("Providence").

25.     Providence was marketed as having been 83% occupied, approximately $13.8 million in gross revenue and $1.5 million of net revenue (i.e., an 11% return). HH, on the other hand, was a mixed assisted living and intensive care living building that allegedly called for an additional 30 units converted to assisted living while being only 68% occupied. The selling memorandum clearly paired the two as one investment. Said representations were specifically repeated in various Feiner emails to the investors after the Campus was purchased. A copy of said Selling memorandum is attached hereto as Exhibit 1.

26.     As a result of such representations, Ari and Shanie invested $100,000 as did Lois and her then husband and CST in the "South Holland HC Campus."

27.     However, unbeknownst to Plaintiffs and the other investors, Feiner caused to be created two similarly named limited liability companies regarding the South Holland Campus on the same date in April, 2013. One was called FNR SH Healthcare, LLC ("Healthcare") and that was the LLC that the Plaintiffs received Federal tax form K-1s each year – thinking that it owned all of the Campus. In truth, the second LLC, FNR South Holland LLC ("SH") was the LLC in which Feiner caused to obtain title to Providence, the more valuable skilled nursing facility. Healthcare was given title to HH instead.

28.     It is believed that in splitting the properties amongst two separate companies, Feiner was both able to obtain a greater membership interest in the net proceeds from at least Providence, if not

both companies, while masking his failure to contribute equity to the companies.

29.     Recent reviews of the Campus ledgers revealed hundreds of thousands of dollars being diverted to Feiner in the form of "distributions" and loans to him, FNR, and numerous other Feiner related entities.

30.     Then adding further injury to Plaintiffs, unbeknownst to the company members and without seeking their approval, Feiner sold Providence on September 30, 2016 and received net proceeds in the approximate amount of $3.6 million ("Sales Proceeds"). In clear violation of the LLCs' operating agreements, copies of which are attached hereto as Exhibits 2 and 3, respectively, and Illinois law, Feiner kept all of the Sales Proceeds, with no distributions to any of the members.

31.     When the sale was discovered in 2017, and asked what happened to Providence, Feiner intentionally lied and told the Plaintiffs that the mortgage holder had taken all of the Sales proceeds to reduce the loan on HH. However, Feiner was not paying the mortgage holder on HH and Feiner announced he was going to once again transfer HH back to the lender – his go-to move after stripping an investment of its equity.

32.     However, when confronted by Community leaders, Finer admitted to having secretly sold the properties and absconded with the funds.

33.     Unfortunately for Feiner's plan, two South Holland members filed a RICO action in this Court, entitled *Shulman and Godin v Feiner, et al*, Case No, 1.-cv-06769 in which they asserted that Feiner, FNR and another partner had defrauded them out of funds in excess of $25 million (the "Shulman Case"). They forced Feiner to relinquish both his Managing Member and other membership interests in both Healthcare and SH and are running HH currently. Pursuant to this Court's docket, the Shulman Case was settled for payments in unknown amounts over a ten year period.

**Mountain Crest**

8

34.     The next Feiner scheme related to a pitched investment in July, 2014 in another skilled nursing facility located in Cincinnati, Ohio called Chateau at Mountain Crest Nursing and Rehabilitation Center. The underlying real estate was owned by FNR Mountain Crest, LLC. ("Mountain Crest"), a Delaware limited liability company created by Erez Baver, ("Baver") FNR's Vice-President.

35.     Based on Feiner representations as to the likely substantial success of the facility, the Plaintiffs each invested $100,000 except for Doniel which invested $120,000. And, as with all other of the investments, there were regular distributions until early 2016 when Baver informed all members that due to "lender requirements", all distributions would be "delayed." No further distributions were ever made.

36.     Again, recent reviews of the Mountain Crest ledgers showed large distributions and loans to Feiner, Baver and Feiner related entities. For example, in June, 2014 shortly after the creation of Mountain Crest, the ledgers show a 'loan" to FNR of $200,000. This loan was followed the next month with $50,000 loans to FNR Akron, LLC; FNR Westlake, LLC; and FNR.[2] The ledgers show at least 14 other "loans" to FNR, another dozen or more loans to Baver and other Feiner related entitles and more than $405,000 in distributions to Feiner and more than $110,000 distributions to Baver.

**Morris**

37.     The next in the series of schemes was a skilled nursing facility located in Morris, Illinois called Park Pointe Healthcare and Rehabilitation Center. The facility was owned by a separate entity and Feiner caused to be created a limited liability company entitled FNR Morris, LLC ("Morris"). Morris entered into a lease agreement with the owners of Park Point.

38.     In this company, Ari and Shani invested $162,500; Lois invested $275,000, CST invested

---

[2]The Akron and Westlake loans were repaid four days later, showing that Feiner used his Managing Member status and investments as banks to other companies in which he was involved.

$162,500 and SJK invested $100,000.

39.     As with the other companies in which Feiner induced the Plaintiffs to invest, regular quarterly cash disbursements were made to the Plaintiff. This continued until April, 2016 at which time, Feiner notified the members that the lender was requiring semi-annual reports and that no distributions could be made prior ro those reports being delivered to the bank. Thus, he said, while the amounts of the distributions were to be be same, the quarterly distributions were to be only made twice a year. However, the July, 2016 distribution was not sent out until September 30, 2016 and none were received thereafter. – although he told members on February 1, 2017 that he expected the distributions to be out by months end and that he stated in June, 2017 that while State reimbursement was late, the entity was still profitable.

40.     However, again a recent review of Morris' tax returns tells a different story as to why there were no more distribution thereafter. Those returns showed net income in excess of $407,000. However, Feiner distributed more than $829,000 to himself – although his alleged membership share would have called for only $222,000 in distributions allowed to him.[3] In addition, the returns showed that membership interests totaling more than 100% were allocated with Feiner's share being the overage (and constantly fluctuating). Moreover, said distributions violated morris' operating agreement in which all investors were to receive a 14% priority return.

41.     After the fraud was discovered in 2017, again Godin and Shulman forced Feiner to admit his guilt in the presence of Community leaders and to relinquish to them his member interests and Managing Member status to them.

---

[3]His alleged membership share was approximately 16.17, but he took almost 61% of all cash distributed.

**NVP Associates**

42.    In 2014, Feiner approached Ari's brother, Doniel, to invest in another skilled nursing to be owned by FNR NVP Associates, LLC, an Illinois limited liability company ("NVP"). Doniel personally invested $140,000 in NVP.

43.    It was recently discovered that Feiner made numerous material misrepresentations to various of the investors, including:

    a.    He told different investors different purchase prices for the property to be bought.

    b.    That the property was going to be purchased by a regular commercial mortgage, bearing interest at an approximate rate of 5%. Instead, the investors later discovered that he had borrowed money from third parties at 15% interest.

    c.    The sales documents promised cash distributions of 15% from rent. However, because of the hidden loan, the property could not generate that return.

    d.    In order to meet the promised return, he was using the other partnerships and entities he was involved in to "lend" NPV stuffiest funds to make those distributions.

    e.    When even that source of funds dried up, he stopped making distributions and told the investors that it was because the funds were needed to pay maintenance and other building issues.

44.    As with all other investments, Feiner used NVP as a personal piggy bank – unentitled distributions, loans, and use of investors' funds to pay other investors' investments to pay personal expenses.

45.    Once again, inflamed investors forced Feiner to give up both his Managing member

interest as well as his member interests in the Company.

**Additional Schemes.**

46.     Feiner's numerous schemes to defraud covered a wide net. In one scheme to defraud, Feiner induced Israel Starck, a 90-year old holocaust survivor, to invest $2.5 million to purchase Feiner's membership shares in LLC's by representing to Mr. Starck that he would receive a substantial fixed return. Feiner never intended to meet that obligation.

47.     In numerous instances, Feiner did not own the membership interests that he purportedly sold to other investors.

48.     Another victim, Henry Lieberman, was defrauded out of $1.5 million by promises of distributions in return for Feiner's membership shares.

49.     Feiner went as far as to abuse his standing in the Jewish community by inducing a group of Jewish day school teachers to combine their savings in order to invest with them by promising returns they could not get elsewhere. In an attempt to secure their family's future, the teachers were defrauded out of their life savings instead.

50.     Defendants' schemes were successful even against a sophisticated banking institution upon whom Feiner committed bank fraud upon by pledging collateral he didn't own but that instead belonged to others, including Plaintiffs, thus rendering the bank unable to recover on a certain $3 million loan. The schemes were of a nature and caliber that even a sophisticated investor was unable to detect them at the time they were perpetrated.

51.     In each and every circumstance, including the investments listed above, the Defendants' schemes relied on further investments from Plaintiffs and others. In order to secure those future investments, Feiner had to make it seem as if the investments were truly generating the returns as promised. So, Feiner had to insure that those distribution continued – most likely, through the

unauthorized use of the various RealCos cash to fund those distributions. Thus, by making distributions from time to time – enough to assuage any suspicions from Plaintiffs and other investors – Feiner and FNR were able to continue their schemes.

## COUNT I
### SUBSTANTIVE RACKETEERING -  18 U.S.C.§1962(a) and §1965

52.     The Plaintiffs repeats and realleges paragraphs 1-51 above as paragraph 52 of this Count I, with the same full force and effect as though fully set forth herein.

53.     At all relevant times, Feiner and FNR were a "person" within the meaning of the Act, 18 U.S.C. §1961(3).

54.     At all relevant times, he Plaintiffs are "persons" within the 18 U.S.C. §§ 1961(3) and 1964©.

55.     Feiner and FNR developed schemes to defraud investors. Their schemes used the FNR entity to aggregate and facilitate the wire transactions which defrauded Plaintiffs and numerous other investors out of quarterly distributions and proceeds from the sale of healthcare facilities.

56.     Feiner solicited the investments of Plaintiffs and other investors in numerous, separate limited liability companies by emailing to them the opportunity to acquire retirement facilities and other real estate located throughout the country. Those solicitation took the form of numerous e-mails between Feiner and Plaintiffs in which Feiner explained that the various opportunities to invest.

57.     Feiner's and FNR's false representations to the Plaintiffs regarding his obligation to contribute capital to the various purchases of the nursing home facilities; his improper withdrawal of cash from the various LLCs; his improper loans to various related entities and use of these limited liability companies as banks for his other businesses; his false representations to banks and other financial institutions that the funds were investments and not loans; and his actions seeking to starve the various LLCs of funds to enrich himself and other business; his indifference to the results of those

distributions and "loans" on the companies' ability to survive; and his intentional obfuscation and concealment of the real financial records and status of the various entities are all part of a pattern of racketeering activity to either invest or control an enterprise.

58.     Feiner used the money derived from this pattern of racketeering activity to invest, acquire control of, or conduct that and other enterprises.

59.     Feiner used the mail and/or wires countless times in furtherance of, and for the purpose of, executing such scheme or artifice which mailing and wires were essential parts of the scheme to defraud the Plaintiffs.

60.     Feiner's racketeering activity in violation of the Act injured The Plaintiffs in his business or property by the loss of all or some of the than $2.7 million in forced loans; the loss of the Excess Distributions and the Loan Proceeds; the lessor deal he had to take regarding the purchase certain nursing home facilities in Florida, as more fully described below, or risk the loss of $1.4 million in previously incurred deposits and advances for said transaction; the incurring of additional interest paid to cover shortfalls, and numerous other damages not yet known or fully ascertained. The Plaintiffs does not have access to sufficient information to fully identify the amount of damages he has incurred because that information is in the sole possession of Feiner and his "investor" partners.

WHEREFORE, the Plaintiffs pray that this Court;

a.     Enter judgment in their favor and against Zvi Feiner and FNR in an amount as proven at trial;

b.     Treble such damages found;

c.     Grant them the cost of bringing this action, including reasonable attorneys' fees; and

d.     Grant them such other and further relief as this Court deems proper.

14

## COUNT II
## RACKETEERING - 18 U.S.C.§1962(c) and §1965

61.     The Plaintiffs repeats and realleges paragraphs 1-60 above as paragraph 61 of this Count II, with the same full force and effect as though fully set forth herein.

62.     Feiner and FNR directly and indirectly conducted and participated in conducting the affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

63.     The predicate acts making up the scheme began as early as 2012 and, based on information and belief, are ongoing.

64.     The pattern of predicate acts engaged in or participated in by Feiner and FNR, as set forth above, constituted knowing use of the mails and wires with specific intent to deceive and defraud, in violation of the federal mail fraud statute, 18 U.S.C. § 1341 and the federal wire fraud statute, 18 U.S.C § 1343.

65.     The above acts were done in furtherance and for the purpose of executing a unified scheme to defraud investors and plaintiffs and were related to one another as it involved common participants, common targets, and common purposes and results.

66.     Feiner and FNR invested the proceeds of their conduct in FNR that form the above-described enterprise affecting interstate commerce, in violation of 18 U.S.C. § 1962(a).

67.     Feiner and FNR also obtained funds directly through acts of racketeering described above, in violation of 18 U.S.C. § 1962(c).

68.     As a result of defendants' mail and wire fraud, plaintiffs have been damaged in their business and property in an amount greater than $2,100,000.00.

69.     Pursuant to 18 U.S.C. § 1964(c), plaintiffs are entitled to recover threefold their damages plus costs and attorney's fees.

WHEREFORE, Plaintiffs pray that this Court;

15

a.      Enter judgment in their favor and against Zvi Feiner and FNR in an amount as proven at trial;

b.      Treble such damages found;

c.      Grant them the cost of bringing this action, including reasonable attorneys' fees; and

d.      Grant them such other and further relief as this Court deems proper.

## COUNT III
## CONSPIRACY TO VIOLATE - 18 U.S.C.§1962© and §1965

70.      The Plaintiffs repeats and realleges paragraphs 1-69 above as paragraph 70 of this Count III, with the same full force and effect as though fully set forth herein.

71.      Ari, Shani, Lois, Doniel, CST and JSK are all "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964©.

72.      Defendants Feiner and FNR are "persons" within the meaning of 18 U.S.C. § 1961(3).

73.      FNR is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise was engaged in and the activities of which affected interstate commerce during the relevant times.

74.      Feiner was employed by or associated with an enterprise, that is, FNR, and did conduct or participate, directly or indirectly, in the conduct of the affairs of FNR through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(l)(B) and 1961(5) and 1962©, which pattern of predicate acts engaged in or participated in by Feiner and FNR, as set forth above, constituted knowing use of the mails and wires with specific intent to deceive and defraud, in violation of the federal mail fraud statute, 18 U.S.C. § 1341 and the federal wire fraud statute, 18 U.S.C § 1343.

75.      As a result of defendants' mail and wire fraud, plaintiffs have been damaged in their business and property in an amount greater than $2,100,000.00.

16

76.     Pursuant to 18 U.S.C. § 1964©, plaintiffs are entitled to recover threefold their damages plus costs and attorney's fees.

WHEREFORE, Plaintiffs pray that this Court;

a.      Enter judgment in their favor and against Zvi Feiner and FNR in an amount as proven at trial;

b.      Treble such damages found;

c.      Grant them the cost of bringing this action, including reasonable attorneys' fees; and

d.      Grant them such other and further relief as this Court deems proper.

## COUNT IV
## BREACH OF CONTRACT – MORRIS

77.     The Plaintiffs repeats and realleges paragraphs 1-60 above as paragraph 77 of this Count IV, with the same full force and effect as though fully set forth herein.

78.     Feiner's distributions to himself in 2013 through 2016, and possibly for later years, was intentional and with malice aforethought.

79.     The intentional diversion and distribution of the monies from Morris was a breach of Morris' Operating Agreement which requires and any all distributions be pro-rata based on the parties' respective membership interests.

80.     Feiner's breach caused damages to the Plaintiffs in an amount not less that $600,000.

81.     Because said breach was intentional and with malice, punitive damages should be awarded to forestall further conduct by Feiner and all similar parties.

WHEREFORE, the Plaintiffs pray that this Court;

a.      Find that Feiner breached the Morris Operating Agreement;

b.      Enter judgment in their favor and against Feiner in an amount not less than $600,000

17

for compensatory damages or such other amount as proven at trial;

c.      Enter judgment in their favor and against Max Feiner in an amount not less than $5,000,000 in punitive damages;

d.      Grant them the cost of bringing this action, including reasonable attorneys' fees;' and

e.      Grant them such other and further relief as this Court deems proper.

## COUNT V
## BREACH OF CONTRACT – SOUTH HOLLAND

82.      The Plaintiffs repeats and realleges paragraphs 1-60 above as paragraph 82 of this Count V, with the same full force and effect as though fully set forth herein.

83.      Feiner's secret sale of the underlying nursing facility and the absconding of the sales proceeds was intentional and with malice aforethought.

84.      The intentional diversion and distribution of the monies from South Holland was a breach of both the SH Operating Agreement and the Healthcare Operating Agreements which require and any all distributions be pro-rata based on the parties' respective membership interests.

85.      Feiner's breach caused damages to the Plaintiffs in an amount not less that $600,000.

86.      Because said breach was intentional and with malice, punitive damages should be awarded to forestall further conduct by Feiner and all similar parties.

WHEREFORE, the Plaintiffs pray that this Court;

a.      Find that Feiner breached the SH Operating Agreement and the Healthcare Operating Agreement;

b.      Enter judgment in their favor and against Feiner in an amount not less than $600,000 for compensatory damages or such other amount as proven at trial;

c.      Enter judgment in their favor and against Max Feiner in an amount not less than $5,000,000 in punitive damages;

d.      Grant them the cost of bringing this action, including reasonable attorneys' fees;' and

e.      Grant them such other and further relief as this Court deems proper.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

87.      The Plaintiffs repeats and realleges paragraphs 1-60 above as paragraph 87 of this Count VI, with the same full force and effect as though fully set forth herein.

88.      As Manager and/or Board of Governors of the various LLCs, Feiner owed a fiduciary duty to both the LLCs and to all members thereof to act in the best interests of the LLCs and members and to not act for his own self interest.

89.      In his role as Manager of the LLCs, Feiner was required to, fulfill his duty of loyalty, obedience, good faith to the LLCs and to fully account to them and their members as to all of the income and expenses of the LLCs.

90.      Notwithstanding those duties, Feiner improperly transferred to himself an unknown amount from the cash of various nursing home and real estate LLCs that was to have been distributed to the Plaintiffs.

91.      Notwithstanding those duties, Feiner improperly transferred to himself, or to various other entities in which he had an interest, cash of the various nursing home and real estate LLCs in the form of alleged "loans", distributions or other withdrawals, which cash and "loans" proceeds were to have been distributed to the Plaintiffs.

92.      Notwithstanding those duties, Feiner improperly transferred to himself the sales proceeds of the South Holland Campus that was to have been distributed to the parties pursuant to the various Operating Agreements.

93.      Until an accounting is received, Plaintiffs believe that Feiner has improperly withdrawn other monies from the LLCs.

19

94.     In addition, Feiner's and FNR's attempt to use his fraudulent bills to justify his cash withdrawals; his failure to comply with his obligations under the various Operating Agreements to fund shortfalls and ensure the mortgages were not in default; his failure to account for the LLCs' income and losses; his constant fraudulent statements regarding the financial health, cash distributions, the diversion of sales proceeds; and his use of flatulent alleged "option agreements" with their ever-changing price requirements are all breaches of his fiduciary duty to the LLCs and Plaintiffs.

95.     Feiner's and FNR's actions were intentional and with malice.

96.     As a result of Feiner's and FNR's actions, Plaintiffs has been damaged.

97.     In addition, punitive damages should be entered against Feiner and FNR.

WHEREFORE, the Plaintiffs pray that this Court:

a.      Enter judgment in their favor and against Feiner and FNR in the minimum additional amount of $2,000,000 or such amount to be proven at trial;

b.      Grant them punitive damages against Feiner and FNR in the minimum further amount of $10,000,000;

c.      Grant them the costs of bringing this cause of action, including reasonable attorneys' fees; and

d.      Grant them such other and further relief as this Court deems proper.

## COUNT VII
## SOUTH HOLLAND FRAUD

98.     Plaintiffs repeats and realleges paragraphs 1-60 above as paragraph 98 of this Count VII, with the same full force and effect as though fully set forth herein.

99.     As stated above, Plaintiffs' investment in the South Holland Campus was predicated upon Feiner's and FNR's representations that the investment consisted of both a skilled care facility as well as a assisted living facility.

100. Such representations were intentionally false and Feiner and NCR knew they were false when they made said misrepresentations.

101. When Feiner and FNR made those intentionally false representations, they knew that Plaintiffs would reasonably rely on those representations when they made their investments.

102. As a result of their reliance on Feiner's and FNR's false representations, Plaintiffs were damaged.

103. In addition, punitive damages should be entered against Feiner and FNR.

WHEREFORE, the Plaintiffs pray that this Court:

a. Enter judgment in their favor and against Feiner and FNR in the minimum additional amount of $2,000,000 or such amount to be proven at trial;

b. Grant them punitive damages against Feiner and FNR in the minimum further amount of $10,000,000;

c. Grant them the costs of bringing this cause of action, including reasonable attorneys' fees; and

d. Grant them such other and further relief as this Court deems proper.

## COUNT VIII
## NPV FRAUD

104. Plaintiffs repeats and realleges paragraphs 1-60 above as paragraph 104 of this Count VIII, with the same full force and effect as though fully set forth herein.

105. As stated above, Plaintiff Doniel's investment in the NPV transaction was predicated upon Feiner's and FNR's representations regarding the purchase price, the terms of the mortgage and the promise of a particular return on his investment.

100. Such representations were intentionally false and Feiner and NCR knew they were false when they made said misrepresentations.

21

101.    When Feiner and FNR made those intentionally false representations, they knew that Doniel would reasonably rely on those representations when he made his investment.

102.    As a result of his reliance on Feiner's and FNR's false representations, Doniel was damaged.

103.    In addition, punitive damages should be entered against Feiner and FNR.

WHEREFORE, Doniel Cohen prays that this Court:

a.      Enter judgment in his favor and against Feiner and FNR in the minimum additional amount of $140,000 or such amount to be proven at trial;

b.      Grant him punitive damages against Feiner and FNR in the minimum further amount of $1,000,000;

c.      Grant him the costs of bringing this cause of action, including reasonable attorneys' fees; and

d.      Grant him such other and further relief as this Court deems proper.

## COUNT IX
## ACCOUNTING

104.    Plaintiffs repeats and realleges paragraphs 1-60 above as paragraph 104 of this Count VIII, with the same full force and effect as though fully set forth herein.

105.    Part of the reason, if not the major reason, why Feiner and FNR have been able to disguise their frauds for such a long time was because they were in possession and in control of the various books and records of the various entities. As a result, they withheld all of the information that would have enable Plaintiffs to ascertain both the fraud and the extent of the fraud.

106.    Said failure to produce and allow inspection of those records were breaches of the Operating Agreements of the LLCs and Illinois law.

107.    Only Feiner and FNR have the necessary information about the operations of the LLCs

22

and the profits thereto.

108.    In order to properly received its legally mandated profits and income of the

LLCs. The Plaintiffs needs to ascertain the income and expenses of the LLCs.

109.    The state of the account is intricate and complicated or so involved that it would be

difficult for a jury to unravel the numerous transactions.

110.    Despite demands, Feiner has failed to account to Plaintiffs for the records regarding the

operations, income and/or profits of the LLCs.

111.    Unless there is an accounting, Plaintiffs will not have an adequate remedy at law.

112.    Only upon such accounting will the amounts due Plaintiffs be established.

WHEREFORE, Plaintiffs prays that this Court require Feiner and FNR to:

 a.   produce all records of the LLCs;

 b.   require Feiner to issue an accounting for all of the income and expenses of the LLCs;

 c.   that the Court grant Plaintiffs the costs of bringing this action, including reasonable

  attorneys' fees; and

 d.   that the Court grant them such other and further relief as this Court deems proper.

## COUNT X
## CONSTRUCTIVE TRUST

113.    The Plaintiffs repeats and realleges paragraphs 1-60 above as paragraph 113 of this Count

X, with the same full force and effect as though fully set forth herein.

114.    Pursuant to the terms of the various LLC Operating Agreements, Feiner had no right

to distribute to himself monies from the various LLCs in excess of his pro-rata share of cash

distributions and/or profits, if any.

115.    Pursuant to the terms of the various LLC Operating Agreements, Feiner and FNR had

no right to lend various related entities monies from the various LLCs.

116.    Pursuant to the terms of the various LLC Operating Agreements, Feiner had no right to either sell substantially all of the assets of the LLCs and to keep the sales proceeds therefrom without the knowledge and the consent of the members of the LLCs.

117.    As stated above, Feiner distributed to himself monies in excess of his pro-rata share of cash distributions and/or profits, lent sums to related entities without the knowledge or permission of the members, and sold substantially substantial all of the assets of LLC' with neither the knowledge or approval of the members of the LLC.

118.    Equity imposes a constructive trust upon the holder of property, such as money, when it would be inequitable for that party to retain possession of it.

119.    It would be inequitable for Feiner to retain possession of either the sale proceeds and/or the excess distributions.

WHEREFORE, Plaintiffs pray that the Court:

a.      impose a constructive trust on the proceeds of the unauthorized loans, the excess distributions, the secret sales proceeds and all other distributions Feiner and FNR made to themselves or third parties, other than Banks which obtained purchase money mortgages on any of the properties in this case;

b.      grant them the cost of bringing this action, including reasonable attorneys' fees;

c.      and grant him such other and further relief as this Court deems proper.

### COUNT XI
### CONVERSION

120.    The Plaintiffs repeats and realleges paragraphs 1-60 above as paragraph 120 of this Count XI, with the same full force and effect as though fully set forth herein.

121.    When Feiner and FNR caused the loan proceeds, the excess distributions and the sales proceeds to be paid to himself or related entities, he knew that he did not have a legitimate or legal

entitlement to those funds.

122. When they caused those funds to be paid to himself and related entities, they converted those funds to their personal use.

123. Via the aforementioned unauthorized acts, Feiner and FNR have exercised and continues to exercise unauthorized and wrongful assumption of control, dominion and ownership over Plaintiffs' distributive share of the money, and he has not returned said monies to the Plaintiffs.

124. The Plaintiffs have a contractual and equitable right in said monies, have a right to the immediate possession of said monies, absolutely and unconditionally, and Feiner and FNR came into possession of those monies through their unauthorized acts while acting in concert with each other.

125. Plaintiffs has made a demand to Feiner and FNR for possession of said monies; however, Feiner and FNR have refused to return the funds to Plaintiffs.

126. As a direct and proximate result of Feiner's and FNR's aforementioned misconduct, Plaintiffs have been and continues to be deprived of funds belonging to them.

WHEREFORE, Plaintiffs prays that this Court:

a. Find that Feiner and FNR converted the loan proceeds, the excess distributions and secret sales proceeds;

b. Enter judgment in their favor and against Feiner and FNR in an amount not less than $2.1 million for compensatory damages or such other amount as proven at trial;

c. Enter punitive damages in an amount not less than $10 million;

d. Grant them the costs of bringing this action, including reasonable attorneys' fees; and

e. Grant them such other and further relief as this Court deems proper.

Agreements.

ARI COHEN, SHANIE COHEN, COHEN SPECIAL FAMILY
TRUST, LOIS COHEN, JSK FAMILY PARTNERSHIP LP and

DONIEL COHEN


By:_____
            One of their Attorneys

HAROLD L. MOSKOWITZ
8170 McCormick Blvd.
Suite 103
Skokie, Illinois 60076
(224) 251-7254
Attorney Number: 3128347